UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12cv23006

| | |
|---|---|
| **MARIE CHARLEMAGNE,** ) | |
|         Plaintiff, ) | |
| v. ) | |
| **HOMEWARD RESIDENTIAL, INC.,** ) | **[DEMAND FOR** |
| formerly known as ) | **JURY TRIAL]** |
| **AMERICAN HOME MORTGAGE SERVICING** ) | |
| **MORTGAGE SERVICING INC.,** ) | |
| **DEUTSCHE BANK TRUST COMPANY AMERICAS** the ) | |
| parent company of **DEUTSCHE BANK NATIONAL TRUST** ) | |
| **COMPANY,** and **JOHN DOES,** ) | |
|         Defendants, ) | |

**COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES**

Comes now Plaintiff, **MARIE CHARLEMAGNE**, by and through counsel, and alleges the following:

**PARTIES**

1. Marie Charlemagne, Plaintiff, is a citizen of the state of Florida.

2. Homeward Residential, Inc. ("Homeward"), Defendant; is a corporation incorporated in the state of Delaware with its principle place of business in the state of Texas.

3. Homeward was known as American Home Mortgage Servicing Inc. until its name change on or about May 31, 2012.

4. Deutsche Bank Trust Company Americas the parent company of Deutsche Bank National Trust Company ("Deutsche"), Defendant, is a corporation incorporated in the state of New York and its principal place of business is located in the state of New York.

5. John Does are persons or other legal entities whose identities are unknown to Charlemagne and who are therefore sued under these fictitious names.

**JURSIDICTION & VENUE**

6. This court has jurisdictions to hear the claims based upon diversity, federal question, and supplemental jurisdiction. The central dispute involved in this suit is over Charlemagne's residential property located in Miami-Dade County, Florida. Said property exceeded market value of $130,000.00. There is complete diversity of citizenship as Charlemagne is citizen of Florida, Homeward is a citizen of either Delaware or Texas, and Deutsche is a citizen of New York. Additionally, this Court has authority to hear all civil actions arising under the constitution, laws, or treaties of the United States. Charlemagne's federal causes of action are brought

1

pursuant to Fair Debt Collection Practices Act and Real Estate Settlement Procedures Act. This Court has subject matter jurisdiction over Charlemagne's closely related state law claims pursuant to 28 USC §1367. Venue is proper because the property in dispute is located in the Southern District of Florida.

## SUMMARY

7. Charlemagne has had a contentious relationship with Homeward and its predecessor in interest. Homeward has utilized taxes, flood insurance, and hazard insurance to hold Charlemagne's home for "hostage". Homeward's conduct has been marred by illegality. Specifically, Homeward has erroneously determined that Charlemagne's' insurances have lapsed, consistently ignored Charlemagne' protests and evidence that her insurance was still in force, obtained force placed insurance prematurely, held Charlemagne's payments in suspense, misapplied payments, retained two law firm to institute foreclosure proceedings against Charlemagne, misrepresented to Charlemagne that she was in default, fraudulently induced Charlemagne into two agreements to repaying escrow shortages (one which was not recognized by Homeward under their own terms), consistently failed to provide an annual escrow analysis pursuant to state and federal law, retroactively purchased insurance in order to maximize its profits and that of a third party, paid taxes unreasonably late in breach of its contractual obligation, failed to provide responses to Charlemagne's qualified written requests (including failure to respond, incomplete responses, and/or a refusal to respond to certain requests), rejected Charlemagne's insurer in bad faith in order to maximize its profits, failed to disclose policies and practices that affects the fees and charges of said escrow items, negligent accounting, failure to provide notices prior to paying taxes or force placing insurance, assessing excessive, unreasonable, and unsubstantiated fees in contravention of law and agreement, and blatantly refusing to accept the unpaid principal in order to continue its unfair, manipulative, and abusive practices to maximize its profits.[1]

8. The mortgage agreement and accompanied note was entered between Charlemagne and Homeward predecessor in interest Option One Mortgage Corporation ("Option One"). Deutsche has not demonstrated that it has legal or beneficial interest in said property, e.g. assignment, endorsement, and the pooling and servicing agreement. Charlemagne disputes the Deutsche claim to ownership in said property and that she is the true and rightful owner of said property.

9. Charlemagne seeks equitable relief in order to obtain her home free and clear of any lien that is held through unlawful means and practices by Homeward and/or Deutsche. Charlemagne also seeks a judgment quieting title to the subject property. Additionally, Charlemagne seeks legal remedies for Homeward and Deutsche's illegal conduct.

## STATEMENT OF FACTS

---

[1] Charlemagne notes this is not a finite list.

10. Charlemagne's home was severely damaged. In order to repair her home, Marie and David Charlemagne took out a mortgage for $74,200.00 against her home with Option One on April 22, 1995. The legal description of said property is: Lot 13, Block 7, Saga Bay, Section 1, Part 2, according to the thereof, recorded in Plat Book 95, Page 61, of the Public Records of Dade County, Florida. The mortgage was set to end on May 1, 2010. On April 30, 2008, Option One Mortgage was sold to American Home Mortgage Servicing, Inc.

**Bankruptcy**

11. On March 12, 2001, Charlemagne initiated a Chapter 13 bankruptcy proceeding. In a period of five years, Charlemagne paid her debts pursuant to her Chapter 13 plan. Option One was the largest creditor under said plan. As apart of repaying Option One, Charlemagne requested the alleged debts due to Option One. In response, Option One informed Charlemagne's counsel, as of June 12, 2001 that she owed $81,722.58, including an unpaid principal of $63,114.95, interests in the amount of $10,969.33, and **escrow** in the amount of **$3,848.12**.

12. On August 21, 2006, Charlemagne was discharged from all debts outlined in the plan. During Charlemagne's bankruptcy, Option One did not communicate with her and failed to provide her escrow analysis pursuant to Florida and Federal law.

13. On May 18, 2004, *Bankers Trust Company of California, N.A.[2] as Trustee under the pooling and servicing agreement dated as of March 15, 1995, CTS Home Equity Loan Trust 1995-1 by Option One Mortgage Corporation* ("Bankers") filed a Motion for Relief from Stay. Option One requested that the bankruptcy Court granted it relief from stay because it allegedly lacked adequate protection for its interest in the collateral (i.e. home). On July 9, 2004, the Court denied said motion.

14. On September 14, 2006, the bankruptcy Court granted an order deeming mortgage and property taxes current by Chapter 13 plan for Charlemagne's home. Additionally, the Court decreed that fees, charges, and expenses that Option One charged were discharged.

**Post-Bankruptcy Agreements**

15. After discharged, representatives of Option One began constantly calling and harassing Charlemagne in regards to making payment.

16. On October 17, 2006, Option One sends Charlemagne a letter stating she has been in default as of April 1st, 2006, a period in which Charlemagne was petitioning for bankruptcy. The letter stated she owed the following: [3]

---

[2] In 1998, Bankers Trust Company of California, N.A was acquired by Deutsche.
[3] Homeward sent Charlemagne an incomplete payment history in March 2012. Charlemagne discovered from said history that the amounts presented in the October 17, 2006 letter of default did not match the amounts allegedly owed from the history.

3

| Total Monthly Payment Due | $ 6, 230.35 |
|---|---|
| Accrued late Charges | 53.40 |
| NSF Fee Due | .00 |
| Other Fees Due | 9345.58 |
| Less Suspense Amount | .00 |
| Total Due | $15, 629.33 |

17. Based on Option One's misrepresentations that Charlemagne was in default and she would lose her house if she did not pay, she entered into a forbearance agreement. As a result, Charlemagne paid Option One in excess of $15,000.00 in order to keep her house.

18. Approximately, two months after completing payments on the forbearance agreement, by and through counsels[4] the parties entered into a stipulation to repay escrow shortage at discharge. Charlemagne was to pay an additional $356.99 per month from May 1, 2007 through May 1, 2012. Though Charlemagne executed the agreement, Option One and their successor in interest did not recognize the agreement after May 1st, 2010.[5]

19. Accordingly, Charlemagne made double payments as both agreements concerned the same fees/charges assessed during her bankruptcy.

20. In the years of 2006 and 2007, Homeward did not provide an escrow analysis for escrow deficiencies.

**Improper Mortgage Servicing Conduct**

21. On March 11, 2008, Option One stated:

> Option One Mortgage Corporation has received funds in the amount of $1348.04, which appear to have been tendered for the purpose of making a payment on the subject loan. Unfortunately, this payment was not sufficient to cover the full amount due of $2,492.62 (this consists of principal and/or interest, a monthly contribution to your tax and insurance impound account).

22. On March 30, 2008, Charlemagne sends a qualified written request to Option One for a breakdown of her mortgage increase and explains that she has paid her taxes and insurance and provides proof of such. Additionally, Charlemagne requested a breakdown and validation of the amount due and payment history.

23. In a letter dated April 22, 2008, Option One states that Charlemagne mortgage payment was more than 20 days delinquent. In response, Charlemagne explained to Option One that she made April 2008 payment.

---

[4] Option One's Counsel who orchestrated this agreement was the same counsel who filed the Motion for Relief from Stay.
[5] Charlemagne has attempted to make payments after May 1, 2010 but Homeward refuses to accept any payments based on the loan's maturation. Homeward will only accept the *alleged* full amount which happens to be over $60,000.00 as of the date of this Complaint and consistently changes as Homeward arbitrarily and capriciously assesses charges on the account. Pursuant to the agreement, Homeward was obligated to accept payments after the maturation date.

4

24. On April 30, 2008, Option One is sold to American Home Mortgage Servicing, Inc. Homeward or Option One did not notify Charlemagne of this transfer.

25. Despite Charlemagne's protest, on May 5, 2008, Option One sends Charlemagne a letter stating she has been in default as of April 1, 2008. The letter stated she owed the following:[6]

| | |
|---|---|
| **Total Monthly Payment Due** | $ 4,701.32 |
| **Accrued late Charges** | .00 |
| **NSF Fee Due** | .00 |
| **Other Fees Due** | 12,980.53. |
| **Less Suspense Amount** | 1348.04 |
| **Total Due** | $16,333.81 |

26. On May 13, 2008, Option One/Homeward makes an advance escrow payment, increases the total payment without notice or explanation.

27. In the year of 2008, Homeward did not provide an escrow analysis for escrow deficiencies.

28. In a letter dated January 12, 2009, Homeward stated:

> We recently received a copy of your insurance policy for the above-referenced property. The coverage amount on your insurance policy does not adequately insure your property. We encourage all homeowners to obtain insurance for the full replacement value of their dwelling and other structures. We require that your insurance coverage be the higher of your loan's outstanding balance or 80% of the replacement value of your property.

29. In a letter dated January 13, 2009, Homeward stated:

> The policy you provided is written by an insurance company which does not meet our financial rating requirements for insurance companies. We require that insurance be written through a company that has an A.M. Best rating of "B" with a financial rating of "III" or better or a Demotech Rating of "A" or better.

Based on the aforementioned, Homeward rejected Charlemagne's policy. Option One, Charlemagne's prior servicer and noteholder, did not have an issue with regarding the adequacy of Charlemagne's insurance coverage or her insurance company. Homeward arbitrarily and capriciously instituted these policies once it became servicer.

30. On January 14, 2009, Homeward paid $13,152.17 in taxes. This payment was made for the years of 2007 and 2008. Homeward made payment for the 2007 year nearly a year and a half after said payment was due.

31. In the year of 2009, Homeward did not provide an escrow analysis for escrow deficiencies.

---

[6] Again, the incomplete payment history provided in March 2012 disclosed that the amounts presented in the May 5, 2008 letter of default did not match the amounts allegedly owed.

32. In January 2010, Homeward claimed that Charlemagne was missing payment for the month of December 2009. Charlemagne responded to Homeward and stated that there was no payment missing, and provided Homeward with the proof that she paid for the months of September through December 2009. Charlemagne explained that Homeward did not account for her September payment and that there was an error in their accounting.

33. Charlemagne sends Homeward a qualified written requests for a payoff statement on January 10, 2010, because her loan will mature on May 1st, 2010.

34. On January 12, 2010, Homeward pays 2009 county taxes in the amount of $4,587.38. Homeward fails to provide notice to Charlemagne.

35. On January 19, 2010, Moss Codilis LLP, a debt collector retained by Homeward, sought an amount for $15,188.58 resulting for default on December 1, 2009. This is the same default that Charlemagne explained to Homeward that she made said payments. On January 22, 2010, Charlemagne requests from Moss Codilis a breakdown of the alleged debt of $15,188.58.

36. On February 16, 2010,Homeward makes a payment of $5,471.75 for hazard/homeowner insurance for an insurance policy that is not set to expire until May 2010. Homeward provides no notice and pays for the hazard insurance prematurely.

37. On February 23, 2010, Charlemagne sends a qualified written request for a breakdown of the alleged debt of $15,188.58. Specifically, Charlemagne states not to just mention the other fees but to inform me about these other fees because she needed to know what the other fees were. Homeward does not respond to said request.

38. On March 9, 2010, Charlemagne paid for flood insurance.

39. On March 12, 2010, Homeward finally sends a payoff statement after the 60 days required by law.

40. March 19, 2010, Homeward informed Charlemagne based on the security instrument that they will continue to make timely disbursement of insurance and taxes.

41. On March 21, 2010, Charlemagne sends a qualified written request for a payoff statement and detailed information regarding the $13,082.37 in other fees. Specifically, the correspondent states:

> This is to inform you that this is my third attempt to obtain a detailed explanation regarding the amount of $13,082.37 including dates of transactions on my account I have never received any response but a payoff statement…Also I am asking to stop your representatives to call me several times daily requesting for this amount. I am a sick person and it is very stressful for me. I am willing to pay only if I owe this money.

6

42. In a letter dated March 31, 2010, Homeward states the following fees and charges[7] have been assessed and remain outstanding on the account:

| Interest on secured escrow advances | $13,078.72 |
| Verification of Mortgage Fee | 20.00 |
| Property Inspection Fees | 172.77 |
| Fax Fees | 15.00 |
| Payoff demand Statement fees | 75.00 |
| Late fees | 53.40 |
| Total | $13,361.49 |

Additionally, the correspondent does not acknowledge that Charlemagne has paid the September 2009 payment.

43. On April 6, 2010, Charlemagne sends a qualified written request for an explanation of $13,078.72 amount. On April 7, 2010, Homeward acknowledges the receipt of the April 6, 2010 letter. Homeward does not respond to said letter within the 60 days provided by law. This inquiry remains unanswered.

44. On April 23, 2010, Charlemagne sends another qualified written request for an explanation of the $13,078.72. In the letter, Charlemagne states she has not received a response regarding her inquiry and provides a copy of the September check that Homeward claimed they did not receive.

45. In a letter dated April 29, 2010, Homeward states that December 9, 2009, Homeward received a payment in the amount of $1248.00; out of which, $1,186 was applied to the September 1, 2009 payment, and $61.60 was placed in the suspense account on December 11, 2009. Charlemagne protested and provided proof to Homeward that she paid for September and there was no need to apply said payment to September 1, 2009. This protest is ignored. To date Homeward has failed to correct this error.

46. On May 1, 2010, Charlemagne sends another qualified written request explains that they have failed to respond to her escrow inquiries regarding the $13,078.72 amount. The letter also states her continued frustration with Homeward's unfair trade practices.

47. On May 1, 2010, the loan matured.

48. In a letter dated June 25, 2010, Moss Codilis provides debt verification of Charlemagne's February 24, 2010 debt dispute. Specifically, the letter stated:

| Delinquent Payments | $2998.64[8] |
| Late Charges | 53.40 |
| Other Fees | 13,361.49 |

---

[7] The incomplete payment history provided in March 2012 disclosed that the amounts presented in the May 31, 2010 letter does not match the amounts allegedly owed for said dates.
[8] This amount is unsubstantiated and has not been explained by Homeward.

7

| **Recoverable Fees** | $579.29 |

49.     On October 21, 2010, Charlemagne is notified through a correspondent that Homeward retained Florida Default Law Group to pursue a foreclosure against Charlemagne.  In response, Charlemagne disputes the validity of the charges and inquires about the extraneous charges.  Florida Default Law Group provides the following:

| **Unpaid Principal** | $879.96 |
|---|---|
| **Interest** | 58.23 |
| **Accumulated Late Charges** | 53.40 |
| **Property Inspections** | 318 |
| **Escrow Shortage** | 37,128.30 |
| **BPO/Appraisal** | 390 |
| **Recording Fee** | 10 |
| **Statement Fee** | 115 |
| **Express Charge** | 5.94 |
| **Total Payoff Amount**[9] | $38,958.83 |

50.     Two separate debt collectors retained by Homeward within a matter of four months stated Charlemagne owed different amounts on the same account. Based on the incomplete payment history provided on March 2012, no significant fees incurred on the account that represented the differences between the two stated amount.

51.     On November 18, 2010, Homeward paid $3,183.45 for county taxes for the 2010 year.  Homeward did not provide notice to Charlemagne of said payment.

52.     On January 31, 2011, Homeward prematurely pays for flood insurance due for 2011 in the amount of $1401.40.  Charlemagne is still under her current flood insurance. Homeward did not provide notice to Charlemagne.

53.     On June 15, 2011, Homeward prematurely pays for hazard insurance in the amount of $3351.00. The hazard insurance is set to expire on May 2012. Homeward did not provide notice to Charlemagne.

54.     On November 1, 2011, Homeward pays taxes for 2011 year in the amount of $2,888.80. Homeward did not provide notice to Charlemagne.

55.     In the year of 2011, Homeward did not provide Charlemagne an escrow analysis.

---

[9] This payoff statement expired two days prior to the issuance of the letter.

56. On February 20, 2012, Homeward paid hazard insurance in the amount of $404 for the 2010 year. On May 1st, 2012, pays for hazard insurance in the amount of $4681.00 for the 2010 year. Homeward applies payment for insurance for years that have expired.

57. On March 3, 2012, Charlemagne sends a qualified written request for: payment history made for said property associated with said loan, all communications made by Homeward or its agents in the effort to collect the charges Homeward believe is due, any and all documents, statements, correspondence reflecting escrow charges, forced placed insurance, taxes paid, and the like, and an alleged total payoff that is necessary to obtain the satisfaction of mortgage. In a letter dated on March 19, 2012, states that they have received the qualified written request.

58. In a letter dated on March 28, 2012, Homeward provides an incomplete payment history and stated they are not required to produce the other requested documents pursuant to RESPA. The incomplete payment history revealed that Homeward assessed extraneous and unsubstantiated fees. For example, Homeward assessed fees for property inspection. Charlemagne cannot recall one time where an agent on behalf of Homeward has inspected her property. Additionally, Homeward states that the payoff statement was made on March 28, 2012 and will be sent separately. The payoff was never sent to Charlemagne. Finally, Homeward stated the following is due on the loan:

| Loan payment Amount | $2998.64 |
| Fees in the Amount | 13,177.37 |
| Late Fees | 53.40 |
| Total Amount | $16,229.41 |

59. Charlemagne has sent payments to Homeward and its predecessor but has refused to accept payment after the maturation date. In fact, On April 4, 2012, Charlemagne sends payment for the unpaid principal of $879.96 and Homeward rejects said payment.

60. On May 3, 2012, Charlemagne sends a qualified written request for the payoff statement since the payoff statement was never sent to Charlemagne. Homeward does not acknowledge receipt of said letters within the 20 days required by law.

61. On June 8, 2012, Charlemagne sends her third qualified written requests for the payoff statements. Homeward does not acknowledge receipt of said letters within the 20 days required by law.

62. After three requests in 2012, the payoff statement was finally mailed out on June 28, 2012. Payoff statement stated that Charlemagne owed:

| Unpaid Principal Balance | $879.96 |
| Total Interest Due | 235.77 |
| Past Statement Fee | 75.00 |

9

| Past Fax Fee | 20.00 |
|---|---|
| Accumulated Late Charges | 53.40 |
| Corporate Advance | 1,447.15 |
| Escrow Advance | 58,299.90 |
| Total | $61,011.18 |

This payoff statement expired on the June 25, 2012. Homeward printed the statement on June 26 and sent it by mail on June 28, 2012, making the payoff statement worthless.[10]

63. On August 10th, 2012, Charlemagne received a correspondent from Homeward that it was not the holder and owner of the loan and explained that it was the mortgage servicer. Additionally, Homeward stated that Deutsche was the owner and holder of the note. Charlemagne disputes the validity of Deutsche ownership.

64. In the year of 2012, Homeward did not provide an escrow analysis for escrow deficiencies.

65. Any amount alleged by Homeward and Deutsche owed is disputed by Charlemagne. As the amount alleged is a cumulative of misapplication of payments, assessment of excessive and unsubstantiated fees in contravention of law and agreement. To date, Charlemagne has paid in excess of $130,000.00 for a loan that was originally worth $74,200.00. Charlemagne has suffered damages as result of Homeward's conduct, including but not limited, emotional distress, adverse credit rating, diminish property value, attorney's fees, costs of correspondence, and lost time taken from work dealing with Homeward.

### CLAIM I: BREACH OF CONTRACT (MORTGAGE AGREEMENT)

66. Option One and Charlemagne entered into a mortgage agreement that provided various duties. The agreement was executed on April 22, 1995. Agreement was binding on Option One's successors in interest.

67. The consideration for said agreement was Charlemagne's home as collateral and the repayment of said loan exchange for $74,200.00.

68. Pursuant to the mortgage agreement, Homeward materially breach said contract by:
   a. Failing to make timely payments of escrow items,
   b. Failing to analyze annually the escrow account,
   c. Failing to verify escrow items,
   d. Failing to provide Charlemagne an annual accounting of escrow funds, showing credits and debits to the account, and the purpose for which each debit to the account was made,
   e. Failing to apply payments correctly and adequately pursuant to the mortgage agreement,

---

[10] This is a quintessential example of Homeward's bad faith. A payoff statement is a document that informs the borrower the following amounts will satisfy the remaining obligations on the loan if received by the expiration date. Charlemagne cannot satisfy her obligations where Homeward intentionally prints and mails out the payoff statement after the expiration date.

   f. Failing to accept Charlemagne's insurance pursuant to the mortgage agreement and unreasonably withholding said approval for insurance. The agreement states that: the insurance carrier providing the insurance shall be chosen by borrower subject to lender's approval which shall not be unreasonably withheld…All insurance policies and renewals shall be acceptable to lender.

   g. Applying loan charges to Charlemagne account that are unreasonable, excessive, unsubstantiated, or in contravention of state and federal law.

   h. Failing to provide notice of change of loan servicer

69. Charlemagne suffers damages.

70. Pursuant to the Mortgage Agreement, parties waived the right to assert a statute of limitations defense. Therefore, Homeward and/or Deutsche are estopped from asserting statute of limitations if they claim to be a successor in interest.

### CLAIM II: BREACH OF CONTRACT AGAINST HOMEWARD
### (STIPULATION TO REPAY ESCROW SHORTAGE)[11]

71. Charlemagne offered to repay the escrow shortage to Homeward an additional $356.99 per month beginning May 1, 2007 and ending May 1, 2012.

72. Homeward accepted this offer.

73. The consideration for said agreement was $21,419.40 paid out in sixty months.

74. Pursuant to said stipulation, Homeward has materially breach said contract by failing to accept said payment after the maturation date of the loan, May 1, 2010.

75. Charlemagne suffers damages.

### CLAIM III: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### AGAINST HOMEWARD AND DEUTSCHE

76. Charlemagne and Option One entered into the mortgage agreement. The mortgage agreement contained a provision that allowed the mortgage servicer to force-place an insurance policy on Charlemagne if her hazard or flood insurance lapsed.

77. As a mortgage servicer, Homeward, is permitted to unilaterally choose the company to purchase force-placed insurance from and have an obligation to exercise their discretion n good faith and not choose the company capriciously and in bad faith (solely for their own financial gain) instead of seeking to continue or reestablish the prior insurance policies or seeking competitive bids on the open market in good faith.

---

[11] This claim is pled in the alternative, as this was an unenforceable agreement because Homeward failed to comply Fla. Stat. § 501.137(2) and 12 U.S.C. § 2609(b) and misrepresented that Charlemagne was in default. *See infra Claim VI: Unjust Enrichment.*

11

78. The mortgage agreement contained an implied covenant of good faith and fair dealing whereby Homeward agreed to perform the obligations in good faith by not charging excessive and/or unreasonable fees for the force-placed insurance for the purposes of maximizing its own profits at Charlemagne's expense.

79. Homeward's conduct did not comport with Charlemagne's reasonable contractual expectations:
    a. Selecting an insurance policy in bad faith and in contravention of the parties reasonable expectations, by purposely selecting exorbitantly-priced force-placed insurance policies to maximize Homeward's profit;
    b. Failing to seek competitive bids on the open market and contracting deals where by the insurance policies are continually purchased through the same companies without seeking a competitive price;
    c. Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Charlemagne and misrepresenting the reason for the cost of said policies, e.g. financial rating;
    d. Collecting a percentage of whatever premiums are charged to Charlemagne and not passing that percentage on to Charlemagne, thereby, creating the incentive to seek the highest-priced premiums possible;
    e. Retroactiviely placing exorbitantly-priced policies for time periods that have already passed;
    f. Prematurely placing the exorbitantly-priced policies prior Charlemagne's current policies lapsing; and
    g. Refusing to provide Charlemagne a valid payoff in order for her to satisfy her obligation prior to the expiration date.

80. Homeward's conduct is a direct, proximate, and legal cause of Charlemagne's damages.

## CLAIM IV: EQUITABLE ACCOUNTING

81. A party seeking equitable accounting must show the existence of a fiduciary relationship or a complex transaction and must demonstrate that the remedy at law is inadequate.

82. The transaction between Charlemagne and Homeward is complex. The complexity of this transaction, lies in Charlemagne's involvement in bankruptcy, the acquisition/assignment of the mortgage to successor Homeward, institutional differences of policies/practices that affect the charges/fees placed on Charlemagne's account between Homeward and its predecessor Option One, non-disclosure of said policies/practices to Charlemagne, Homeward's incomplete payment history given to Charlemagne demonstrating inconsistency in amount owed, highly regulated nature of the transaction by state and federal law, and the intentional placement of fees on Charlemagne's account in contravention state and federal law.

83. The remedy at law is inadequate. This suit involves Charlemagne's property right. Our jurisprudence has long held where property rights is present equity applies. Additionally, damages cannot make

12

Charlemagne whole because subject of this litigation is unique (i.e. her home) and irreparable harm will result from Homeward's conduct that cannot be fully compensated by a money damage. Homeward and Deutsche continues to hold Charlemagne's property for "hostage" for an unknown and unsubstantiated amount.

### CLAIM V: VIOLATION OF RESPA

84. To state a claim under § 2605(e), Charlemagne must allege: (1) that Defendants are servicers; (2) that they received a qualified written request ("QWR") from the borrower; (3) that the QWR related to the servicing of the loan; (4) that Defendants failed to adequately respond; and (5) that Plaintiffs are entitled to actual or statutory damages.

85. Homeward is a servicer.

86. Homeward received qualified written requests from the borrower on or near the following dates: January 10, 2010, February 23, 2010, March 21, 2010, April 6, 2010, April 23, 2010, May 1, 2010, March 3, 2012, May 3, 2012, and June 8, 2012.

87. The qualified written requests related to the servicing of the loan as follows:
   a. Requesting an explanation of fees,
   b. Requesting numerous payoffs,
   c. Requesting any and all documents, statements, correspondence reflecting escrow charges, forced placed insurance, taxes paid, and the like,
   d. Request for payment history, and
   e. Requesting communications made by Homeward in effort to collect what is due,

88. Homeward failed to adequately respond in the following manner:
   a. Failure to respond,
   b. Made untimely responses
   c. Provided incomplete responses, and
   d. Refusal to respond to certain requests.

89. Charlemagne is entitled to actual and statutory damages
   a. Charlemagne is entitled to actual damages including but not limited to emotional distress, out-of-pocket expenses incurred dealing with the RESPA violation including expenses for preparing, photocopying, and obtaining certified copies of correspondence, lost time and inconvenience, such as time spent away from employment while preparing correspondence to the loan servicer, late fees and denial of credit or denial of access to full amount of credit line.
   b. Charlemagne is entitled to statutory damages because Homeward exhibits a pattern or practice of noncompliance since 2010.

### CLAIM VI: UNJUST ENRICHMENT

90. Charlemagne conferred a benefit to Homeward in the form of :
    a. Overcharges for force-placed insurance policies which are excessive and unreasonable, and are the result of overcharging and overreaching. Homeward entered into an agreement with a third party insurer which would provide force-placed insurance policies to Homeward and Charlemagne, which have been paid for by Charlemagne at prices that were far higher than the market rates for similar policies. Homeward knew that the charges for these policies were excessive and not the result of good faith practices.
    b. The payment in excess of $15,000.00 paid to Homeward that resulted from the fraudulently induced agreement (i.e. she was in default, when she was not). Additionally, these fees and charges were obtained in direct contravention of law. Homeward fail to provide an annual escrow analysis and Homeward should have informed the bankruptcy court of these alleged shortages, therefore, these fees were waived.[12] Additionally, these fees were assessed while Charlemagne was in bankruptcy. Finally, Homeward misrepresented the amount owed.
    c. Fees received pursuant to the Stipulation to Repay Escrow at Discharge, because Homeward was not permitted to assessed because they failed to comply with Fla. Stat. § 501.137(2)[13] and 12 U.S.C. § 2609(b)[14].
    d. Fees received as Homeward "double dipping" pursuant to the forbearance agreement and the stipulation for charges assessed during bankruptcy.
    e. Any and all other fees obtained and/or added in contravention of Fla. Stat. § 501.137(2) and 12 U.S.C. § 2609(b).
91. Homeward has knowledge of these benefits.
92. Homeward voluntarily accepted and retained the benefit conferred.
93. The circumstances are such that it would be inequitable for the Homeward to retain the benefit. Homeward will be unjustly enriched by maintaining possession of said benefits.

### CLAIM VII: VIOLATION OF FDUTPA AGAINST HOMEWARD

---

[12] *See In Re: Dominique*, 368 B.R. 913 (S.D. Fla. 2007) and *Chase Manhattan Mortgage Corp. v. Padgett*, 268 B.R. 309 (S.D. Fla. 2001), both holding servicers waived their right to escrow deficiencies because they failed to provide notice of escrow shortage.

[13] If an escrow account for the taxes or insurance premiums is deficient, the lender shall notify the property owner within 15 days after the lender receives the notification of taxes due from the county tax collector or receives the notification from the insurer that a premium is due.

[14] If the terms of any federally related mortgage loan require the borrower to make payments to the servicer (as the term is defined in section 2605(i) of this title) of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall notify the borrower not less than annually of any shortage of funds in the escrow account.

94. In order to state a claim for a violation of Florida Deceptive Unfair and Trade Practice Act, a Charlemagne must allege: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.

95. Homeward committed the following deceptive acts or unfair practices:

   a. Failure to inform Charlemagne in a clear and timely manner about any fees, penalties, or other charges (including charges for any force-placed products) that have been imposed, and the reasons for their imposition.

   b. Failure to give Charlemagne her annual statement that details the activity of Charlemagne's escrow account, showing account balance and reflecting payments for Charlemagne's property taxes, homeowners insurance and other escrowed items.

   c. Failure to acknowledge Charlemagne's protest concerning the errors on her account and correct said errors on Charlemagne's account.

   d. Failure to provide a payoff statement within a reasonable time,[15] including providing expired payoff statements.

   e. Arbitrarily and capriciously rejecting insurance policies put in place by Charlemagne.

   f. Failing to properly credit Charlemagne's account for payments made.

   g. Using false claims that Charlemagne did not make payments in order to justify the imposition of late fees and escrow deficiencies.

   h. Failing to recognize Charlemagne's insurance policies in effect, and then force placing insurance policies unnecessarily.

   i. Failing to timely post Charlemagne's payment.

   j. Retroactively purchasing insurance in order to maximize its and that of a third party's profits.

   k. Refusing to accept proper payments from Charlemagne, allegedly, because Charlemagne is in default or the loan has matured, and the payment is not large enough to cure the alleged default, thereby causing more late charges to be added and false reports made to credit bureaus.

   l. Repeatedly sending default letters when the loan was not in default.

   m. Failing to timely and accurately apply payments made by Charlemagne and failing to maintain accurate account statements.

   n. Charging excessive or improper fees, e.g. default-related services, property inspection fees, etc.

---

[15] Generally, servicers must give you this statement [payoff statement] if you ask for it and follow the instructions. Your servicer must provide the statement within a reasonable time – generally 5 business days – after receiving your request. Federal Trade Commission, *Facts for Consumer: Mortgage Servicing: Making Sure Your Payments Count*, June 7, 2010, available at http://www.ftc.gov/bcp/edu/pubs/consumer/homes/rea10.shtm, last visited August 16, 2012)

      o. Failing to properly oversee third party vendors involved in servicing activities on behalf of Homeward.

      p. Imposing force-placed insurance without properly notifying Charlemagne and when Charlemagne already had adequate coverage.

      q. Providing Charlemagne false or misleading information in response to Charlemagne complaints.

      r. The cumulative effect of Homeward's unfair and deceptive trade practice is to render Charlemagne in default of her mortgage, which then triggers foreclosure proceedings.

96. Homeward's conduct is the direct, proximate, and legal cause of Charlemagne's damages.

97. The actual damaged sustained by Charlemagne includes but not limited to payment of improper fees and charges, unreasonable delays and expenses to obtain loss mitigation relief, emotional distress, out-of-pocket expenses including expenses for preparing, photocopying, and obtaining certified copies of correspondence, lost time and inconvenience, such as time spent away from employment while preparing correspondence to the loan servicer, and adverse credit rating.

### CLAIM VIII: VIOLATION OF FEDERAL FAIR DEBT COLLECTION PRACTICES ACT AGAINST HOMEWARD

98. Charlemagne is a natural person obligated or *allegedly* obligated to pay a debt.

99. Pursuant to the note and mortgage agreement, she is obligated to pay a consumer debt that is an obligation incurred primarily for personal, family or household purposes. In order for Charlemagne to repair her home she obtained the loan.

100. Homeward is a debt collector—any person using interstate commerce who regularly collects debts. *See Birster v. American Home Mortgage Servicing, Inc.*, 2012 U.S. App. LEXIS 14660 (11th Cir. 2012)(An entity that regularly attempts to collect debts can be a "debt collector" beyond 15 U.S.C.S. § 1692f(6) of the Fair Debt Collection Practices Act, even when that entity is also enforcing a security interest.)

101. Homeward violated FDCPA in the following manner:

      a. In violation of § 1692 (e)(2), Homeward misrepresented the character, amount, or legal status of the alleged debt. Based on the incomplete payment history provided to Charlemagne in March 2012, Charlemagne discovered that the October 17, 2007 letter of default that said amount was not the amount reflective on the payment history.

      b. In violation of § 1692 (f), Homeward utilized unfair or unconscionable means to collect or attempt to collect the alleged debt. Homeward failed to provide Charlemagne a valid payoff in order for her to satisfy her obligation prior to the expiration date. Homeward failing to acknowledge Charlemagne's protest concerning the errors on her account and correct said

16

      errors on Charlemagne's account. Homeward failing to timely apply payments and accurately maintain the loan account.

  c. In violation of § 1692 (f)(1), Homeward attempt to collect any amount not authorized by the agreement creating the debt or permitted by law. Homeward attempts to collect $61,011.18, which is a composition/inclusion of fees and charges assessed waived for failure to comply with Fla. Stat. § 501.137(2) and 12 U.S.C. § 2609(b). Additionally, Homeward attempts to collect unreasonable, excessive, and/or unsubstantiated fees/charges assessed in bad faith in contravention of the mortgage agreement.

  d. In violation of § 1692 (f)(6), Homeward has taken or threatened to unlawfully repossess or disable the Charlemagne's property. Homeward allegedly sent an intent to foreclose letter on September 14, 2011, which Charlemagne never received but learned of in July 2012.

102. All allegations pled in violation of FDCPA have occurred within the statue of limitations. If any violation exists outside of the statute of limitations, Homeward's improper and fraudulent conciliatory conduct tolled said statute of limitations.

## CLAIM IX: QUIET TITLE

103. Charlemagne sues defendants Deutsche and others, and alleges:

104. Charlemagne is an individual residing in Miami-Dade, Florida and has title to the property in controversy as set forth: Lot 13, Block 7, Saga Bay, Section 1, Part 2, according to the thereof, recorded in Plat Book 95, Page 61, of the Public Records of Dade County, Florida.

105. Deutsche is a legal entity who claims an interest adverse to the claim of Charlemagne in certain property. Option One, Homeward's predecessor in interest was the owner and holder of said note. Homeward has disclaimed that it is the holder and owner of said note. Homeward claims that Deutsche is the owner and note holder. No proper assignment, endorsements, or original note has been produced. The note has been separated from the mortgage this clouds Charlemagne's title.

106. Defendants sued as John Does are persons or other legal entities whose identities are unknown to Charlemagne and who are therefore sued under these fictitious names.

107. John Doe defendants include the unknown spouse, heirs, devisees, grantees, creditors, and other parties claiming an interest in the subject property adverse to the claim of Charlemagne by, through, under, or against defendant Deutsche.

108. John Doe defendants also include the unknown spouse, heirs, devisees, grantees, creditors, and other parties claiming an interest in the subject property adverse to the claim of Charlemagne by, through, under, or against David Charlemagne, who at one time claimed to be a cotenant with Marie Charlemagne in the property that is the subject of this action.

109.     John Doe defendants also include the unknown spouse, heirs, devisees, grantees, creditors, and other parties claiming an interest in the subject property adverse to the claim of Charlemagne by, through, under, or against any other person whose existence and identity is currently unknown to Charlemagne.

## PRAYER

Wherefore, the Plaintiffs, MARIE CHARLEMAGNE, for each and every cause of action above demands the following relief against the Defendants:

a. Judgment quieting title in Charlemagne's interest in the above-described property and determining the ownership rights in the property of Plaintiff and Defendants
b. Expectation Damages;
c. Consequential Damages;
d. Reliance Damages;
e. Restitution;
f. Statutory damages where permitted by law;
g. Compensatory general and special damages in an amount in accordance with proof;
h. Reasonable attorneys' fees and expenses of litigation where permitted by law or contract;
i. Costs of suit and interest accrued incurred herein where permitted by law or contract; and
j. Other forms equitable and/or legal relief the Court deems just or proper.

## CERTIFICATION

I certify that a copy hereof will be served on Defendants Homeward Residential, Inc. and Deutsche Bank Trust Company Americas via their registered agent CT CORPORATION SYSTEM, 1200 S. PINE ISLAND ROAD, PLANTATION FL 33324 US.

s/Faudlin Pierre
Faudlin Pierre
Attorney for Plaintiff
18900 NE 1st Court
Miami, FL 33179
(305) 336-9193
FLA. BAR #56770